**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KEVIN PLANKER, | : | |
| | : | Civil Action No. 11-5610 (AET) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHARLES WARREN, | : | |
| | : | |
| Respondent. | : | |

**APPEARANCES:**

Kevin Planker
New Jersey State Prison
Trenton, NJ  08625
     Petitioner pro se

Catherine Antoine Foddai
Bergen County Prosecutor's Office
Bergen County Justice Center
10 Main Street
Hackensack, NJ  07601
     Counsel for Respondents

THOMPSON, District Judge

     Petitioner Kevin Planker ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder and related offenses.  The Respondent is Administrator Charles Warren.  For the reasons stated herein, the Petition shall be denied.

# I.  BACKGROUND

## A.  Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division, on Petitioner's direct appeal of his conviction for the murder, on or about August 14, 1997, of Sandra Terranova.[1]

The Appellate Division first described the circumstances under which Gennadi Zaressky, Terranova's assistant manager at "Rampage," a women's clothing store at the Garden State Plaza Mall in Paramus, and co-worker Barbi Cascasus, filed a missing person's report with the Garfield Police, on August 15, 1997, based on Terranova's failure to report to work, to respond to telephone calls, or to pick up her paycheck.  In connection with that report, they identified Petitioner as Terranova's former boyfriend.  (Answer, Ex. 3, Opinion of Appellate Division at 3-4 (Nov. 13, 2003).)

The Appellate Division then described the course of the police investigation, which transpired over several days, and the evidence police collected.

> Garfield Detective John Prehart spoke with Terranova's mother and went to Terranova's apartament.  Prehart noticed Terranova's mailbox was full, indicating that mail had been accumulating for several days, and, after climbing up the fire escape to Terranova's apartment, opened the screen and entered the apartment.  No one was there.  The door was locked.  Prehart exited through the same window and fire escape. … On August 16, 1997, Prehart went to several residences in Paramus, including the Ranieri and Goldzweig residences.  Nicholas Ranieri, a minor, was a friend of defendant.  The Goldzweig residence was listed on defendant's driver's licenses as his address.  Defendant was not present at either location.  Prehart learned of a phone number for the apartment defendant shared with Dayna Kott, the mother of defendant's child.  Prehart left a message for defendant.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Meanwhile, Prehart went back to Terranova's apartment, where he noticed that the window he had secured the day before was now open. He again entered the apartment through the window. However, he noticed differences in the conditions. The mail that was on the table was strewn about the apartment and the bedroom door, which was opened the previous day, was now closed. He also noticed the apartment door was unlocked.

At about 1:45 p.m. on Sunday, August 17, Prehart received a call from defendant. Defendant informed Prehart that Terranova went to Wildwood and he should look for her there. He also stated Terranova had a history of running away without telling anyone. Defendant described his relationship with Terranova: "I guess we kind of still see each other, not really like -- I haven't slept with her in a long time because she's … been sleeping around … . [W]e hang out and … [i]t's alright, but it's not like a relationship or anything like that." Defendant told Prehart the last time he saw Terranova was the previous Wednesday or Thursday night when he helped her move out of her apartment.

Earlier in the day, Prehart had contacted the Bergen County Prosecutor's Office for assistance. Detective Gregory Donatello from the homicide squad responded to the Garfield Police Department, where he met Prehart at about 2:30 p.m. At 4:30 p.m., defendant called Prehart again, this time acknowledging that he and Terranova were "pretty close." When asked whether Terranova's apartment was normally messy, defendant answered in the negative and said, "if it's messy, … there's something wrong, I guess."

At about 5:15 p.m., Mrs. Ranieri called Prehart and advised that her husband observed defendant pulling up to the Goldzweig residence, a few doors away. Prehart and Donatello responded to that address and asked defendant to accompany them to the Garfield police headquarters. After some discussion, defendant accompanied the officers to the Paramus police headquarters, where Donatello and Prehart proceeded to interview defendant.

(Answer, Ex. 3, Opinion of Appellate Division at 5-7.)

During the police interview, Petitioner provided information regarding the history of his relationships with Terranova and other women, including some turmoil with Terranova during the previous few days.

Defendant explained that he and Terranova dated for a time in high school, in 1993 or 1994, then ended their dating relationship, then resumed it in November or December 1996. Defendant was involved in relationships with other women at the time, including Dayna Kott, who was then pregnant with his child. In that interview, defendant stated that he and Terranova broke up on August 10, 1997, but that he helped her move furniture on August 10 and 11. He

then stated that he last saw Terranova at about 1:00 a.m. on August 16, 1997, when he saw her in her car with two males with long hair. Later in the interview, however, he divulged that he also saw Terranova on August 13 at the Rampage clothing store. At that encounter, Terranova told defendant she thought she might be pregnant. Then, defendant stated that on August 15, he had an argument with Terranova at her apartment regarding the pregnancy.

Defendant stated he left the apartment and drove around for a time, after which he called Terranova from a pay phone across the street from her apartment. Their conversation was interrupted by a call waiting, which Terranova stated was her mother. Defendant did not believe her. He went back up to her apartment and activated the "star 69" return call feature. A male voice answered. Defendant became angry, informed the person on the phone that he was Terranova's boyfriend and that he would find the address of the person on the phone and find him and take care of this matter in his own way. In the background, Terranova could be heard arguing with defendant and upset. After the telephone incident, defendant and Terranova engaged in sexual intercourse. Defendant told Donatello the last time he actually saw Terranova she was in her car, but he was not certain of the date. Defendant described to Donatello Terranova's promiscuous sexual behavior and suicide attempts. …

(Answer, Ex. 3, Opinion of Appellate Division at 7-8.)

Following the interview with Petitioner, police expanded and intensified their

investigation, ultimately locating Terranova's remains.

On the evening of August 17, Detective Brian Callanan of the Bergen County Prosecutor's Office received from Kott a consent to search the 1986 gray Pontiac she shared with defendant. Calanan found in the car a chain saw, gas can, pickax, chopping ax, two shovels, and a bow saw. Callanan did not remove these items from the car.

The next day, August 18, Terranova's 1996 black Mitsubishi Eclipse was located in the truck parking lot of the Vince Lombardi service area off the New Jersey Turnpike in Ridgefield. The car was unlocked, with the sunroof open and the keys on the front passenger seat. In the car was a purse containing various papers in Terranova's name. That afternoon, Callanan met with Nicholas Ranieri, a minor and friend of defendant, at the Bergen County Prosecutor's Office. Ranieri was "visibly shaken," "nervous," and "definitely scared." Ranieri gave some information, but Callanan terminated the interview telling Ranieri, "there was a lot more that he wasn't telling [him] and that [they] would speak again."

On August 19, Kott gave a statement to the police, describing certain items of furniture, including a coffee table, television and television stand, dishes and pots and pans, that defendant brought into their apartment. On August 20,

pursuant to Kott's consent to search, police searched the apartment she shared with defendant. Several items belonging to Terranova were seized from the apartment. During the course of the search, several individuals, including defendant, approached the apartment where they encountered Callanan, who was posted as "perimeter security." Defendant told Callanan he was "wasting [his] time and that [he] should be out catching people who rob banks." Defendant further stated "Just remember no body, no crime." At about 5:00 p.m. on August 20, Callanan again interviewed Ranieri. Ranieri described for Callanan, as he did for the jury, the events involving him and defendant on the morning of August 17. Defendant picked up Ranieri that morning in his gray Pontiac. There were shovels, a chain saw and gas can in the car, which were not normally in defendant's car. Defendant drove Ranieri to Jefferson Township where he pulled off into a dirt road near a chain link fence. Defendant stopped at a clearing and said to Ranieri, "there's a body over there. You have to help me hide it." Ranieri observed a mound about one foot high and six feet long covered with dirt and sticks. Defendant walked over to it, "started hopping on it then he urinated on it." Defendant shoveled more dirt onto the pile and then cut down several trees with a chain saw and pulled them over the mound. Defendant then backed the car down the dirt road a short distance, and cut another tree, causing it to fall across the dirt road so "[n]o one could be able to drive back." Ranieri and defendant were in the clearing for about one hour. Ranieri did not ask defendant whose body was in the grave, and while driving home, defendant told Ranieri "there was a couple people in the world that he wouldn't kill if they put him away and [Ranieri] was one of them."

After giving his statement, Ranieri drew a map of the grave location. That night, Callanan drove Ranieri to the area, but they could not locate the dirt road because of the rainy and foggy weather conditions. The next day, August 21, Ranieri was able to locate the dirt road and led Callanan to the grave. At about 9:55 p.m. a body was disinterred. It contained clothing and jewelry matching the description given of Terranova.

(Answer, Ex. 3, Opinion of Appellate Division at 8-11.)

At the conclusion of this investigation, police arrested Petitioner for the murder and took

his statement.

Donatello arrested defendant for the murder of Terranova. He read to defendant his <u>Miranda</u> [FN1] warnings, and took defendant to the Rochelle Park Police Department. Defendant declined to sign the <u>Miranda</u> waiver form. Defendant appeared "as if he was not concerned" with the news that Terranova's body was recovered. Instead, defendant was "making gestures with his hands and fingers as if he was playing the guitar." Defendant initially reiterated his previous story that Terranova was at the shore. When asked whether the killing of Terranova was "spontaneous" or an "accident," defendant stood and paced back

and forth for a time, after which he muttered, "accident."

[FN1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant was then taken to the Bergen County Prosecutor's Office, where he signed a Miranda waiver form and recounted the events leading up to the homicide. His oral statement was recounted to the jury. He described that on Thursday, August 14, he went to Terranova's apartment to discuss their relationship. They talked on the steps of her apartment building then proceeded upstairs and engaged in sexual relations. Defendant "felt that the sex wasn't good" and he "did not orgasm" because he felt Terranova was seeing other men. He left the apartment and drove around the block. Then, at about 7:00 p.m., he called Terranova from a pay phone across the street from her apartment. The call was interrupted by a call waiting. Defendant went back into the apartment, checked the caller ID and activated the return call feature. A male voice answered, and Terranova attempted to take the phone from defendant. After a "brief struggle," during which defendant ripped the phone from the wall and stepped on it, breaking it into several pieces, he threw Terranova on the bed. She was crying, and this sexually aroused him. He began to engage in sexual intercourse with her, but thought Terranova was "not into it." They stopped the sexual encounter, and defendant asked Terranova if she was "f---ing" anyone else, to which she replied, "I can't 'f---' anyone. I have to 'make love.'" Defendant ripped Terrranova's shirt and bit her breast. He then took his hands and applied pressure to her throat until she turned red and lifeless. He then threw her to the floor. He put a telephone cord around her neck, intending to make it look like a suicide, but he was unable to find a place from which to hand the cord. He dressed himself and Terranova's body. He left the apartment.

Defendant took Terranova's car. He confided in his friend, Mike Vasile that he had just murdered Terranova, after which Vasile began to cry and told him he did not want to get involved. Defendant obtained a shovel from the shed of his friend Pat Gallagher, and he also told Gallagher that he had killed Terranova. Defendant returned to Terranova's apartment at about midnight on August 15. He carried the body down to the car and drove to Jefferson Township, where he buried it. He then returned the shovel to Gallagher and went back to Terranova's apartment, where he proceeded to take items of her furniture. He transported those items to the apartment in Lodi that he shared with Kott, and he went to sleep.

Defendant also confirmed Ranieri's recitation of the events of August 17 and recounted how he brought Terranova's car to the Vince Lombardi service area. Defendant also stated he was a "real control freak" and in the past he had placed neckties around Terranova's neck as if he was choking her. After giving this oral statement, defendant refused to give a stenographic statement. The oral statement was not recorded.

(Answer, Ex. 3, Opinion of Appellate Division at 11-13.)

Finally, the Appellate Division summarized other evidence developed by the government as well as other testimony presented at trial.

> An autopsy performed on the body on August 22 by the Bergen County Medical Examiner disclosed the presence of spermatozoa with DNA matching defendant in Terranova's vaginal canal. The external exam disclosed bruises surrounding the left eye, on the scapular area on the left side of the back and on the right lower back, which occurred antemortem and were the result of blunt force trauma. There were also bruises on the victim's feet, occurring postmortem, which "could have resulted as a result of her body being dragged." The hyoid bone in the neck was broken, which is a common injury when a person is manually strangled. The cause of death was mechanical asphyxia and blunt trauma to the head and face with an associated finding of fracture of the hyoid bone. An embryo in the early stages of development was found in Terranova's body, with DNA matching that of defendant.

> The trial testimony included descriptions of mistreatment and threats by defendant against Terranova. Cascasus, for example, testified that on Wednesday, August 13, defendant and Terranova engaged in an argument at the store, during which defendant chased Terranova around, calling her a "whore," and stating he was going to "kill her." Cascasus and Zaressky stated defendant would call the store repeatedly, scream at the victim, and call her derogatory names. John Nardino, the male voice on the line when defendant activated the return call feature, stated Terranova was screaming in the background, exclaiming "Hang up the phone. Why don't you just stop. You always do this. Please just leave." According to Nardino, Terranova sounded like she was crying. Further, several people testified they observed defendant driving Terranova's car between August 15 and August 17.

> Defendant testified at trial. He denied killing or burying Terranova and denied confessing to Donatello. The defense theory was that Sandra Goldzweig, a woman with whom defendant had an intimate relationship, killed Terranova out of jealousy. Goldzweig testified. She admitted to her intimate relationship with defendant, but denied ever being jealous or upset with his relationships with other women, including Terranova. She denied killing or burying Terranova.

(Answer, Ex. 3, Opinion of Appellate Division at 14-15.)

B.    Procedural History

At the conclusion of a 15-day jury trial in the Superior Court of New Jersey, Law

Division, Bergen County, Petitioner was convicted of first-degree murder, N.J.S.A. 2C:11-3a (count one), two counts of third-degree burglary, N.J.S.A. 2C:18-2 (counts two and four), third-degree hindering prosecution, N.J.S.A. 2C:29-3 (count three), and two counts of third-degree theft by unlawful taking, N.J.S.A. 2C:20-3 (counts five and six).  On December 17, 1999, Judge Meehan sentenced Petitioner to a term of life imprisonment, subject to an 85% parole disqualifier, and five years parole supervision, in accordance with the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, on count one.  On counts two, four, five, and six, Judge Meehan sentenced Petitioner to five-year terms of imprisonment, concurrent to each other and concurrent to the sentence imposed on count one.  On count three, Judge Meehan sentenced Petitioner to a five-year term of imprisonment, consecutive to the sentence imposed on count one.

On November 13, 2003, the Appellate Division affirmed the convictions, but remanded for resentencing to a non-NERA sentence on count one.  (Answer, Ex. 3, Opinion of Appellate Division (Nov. 13, 2003).)  On December 18, 2003, Judge Meehan resentenced Petitioner on count one to a term of life imprisonment with 30-years parole ineligibility; all other aspects of Petitioner's sentence remained the same.  (Answer, Ex. 7, Da43-Da44.)  On May 6, 2004, the Supreme Court of New Jersey denied certification.  State v. Planker, 180 N.J. 354 (2004).

On July 10, 2004, Petitioner filed his first state petition for post-conviction relief ("PCR"), which he amended in July 2007, May 2008, and June 2008.  Petitioner was represented by counsel, who filed a supporting brief.  (Answer, Exs. 6 and 7, Petitioner's Brief and Appendix to the Appellate Division, on appeal from the denial of post-conviction relief.)  On June 13, 2008, Judge Meehan denied post-conviction relief.  (Answer, Ex. 7, Order, Da315 (June 13, 2008) and Ex. 43, Transcript of PCR Hearing (June 13, 2008).)  On October 7, 2008, the Appellate Division granted Petitioner's motion for leave to appeal as within time and, on

December 31, 2008, the Public Defender's Office entered an appearance on Petitioner's behalf. On June 18, 2010, the Appellate Division affirmed the denial of post-conviction relief. State v. Planker, No. A-0723-08T4, 2010 WL 2471163 (N.J. Super. App. Div. June 18, 2010). Following its grant of Petitioner's motion for reconsideration, the Appellate Division issued an opinion on March 15, 2011, incorporating by reference its prior opinion and again affirming the denial of relief. State v. Planker, No. A-0723-08T4, 2011 WL 867245 (N.J. Super. App. Div. Mar. 15, 2011). The Supreme Court of New Jersey denied certification on September 9, 2011. State v. Planker, 208 N.J. 337 (2011).

This Petition timely followed. Here, Petitioner asserts the following grounds for relief: (1) Petitioner was denied his Sixth Amendment right to self-representation; (2) ineffective assistance of trial, appellate, and PCR counsel, and (3) cumulative error. (Petition, ¶ 12; Amended Petition.) In addition, Petitioner states that he has filed a second and third state petition for post-conviction relief and he asks that this Petition be stayed pending conclusion of proceedings in those matters.[2] Finally, Petitioner has filed two Motions [16, 18] to expand the record. Respondent has answered, Petitioner has replied, and this matter is now ready for decision.

## II. 28 U.S.C. § 2254

Title 28 U.S.C. § 2254 provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

---

[2] Petitioner does not attach copies of the second and third state PCR petitions, nor does he describe in detail the claims asserted therein. He does mention that the second PCR petition includes a claim of ineffective assistance of PCR counsel and that the third PCR petition is a motion to compel the PCR court to rule, apparently on the second PCR petition. (Petition, ¶ 11.)

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II), cited in Ely v. Erickson, 712 F.3d 837 (3d Cir. 2013).

A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. See also Moore v. DiGuglielmo, No. 09-2189, 489 F.App'x 618, 624 n.2 (3d Cir. 2012) (noting the same). To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Williams, 529 U.S. at 409. "This standard … is 'difficult to meet': To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged

state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Metrish v. Lancaster, 133 S.Ct. 1781, 1786-87 (2013) (quoting Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011)). In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999), cited in Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)), cited in Wright v. Vaughn, 473 F.3d 85, 91 (3d Cir. 2006). With respect to claims presented to, but unadjudicated by, the state courts,[3] however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Holloway v. Horn, 355 F.3d 707, 718 (3d Cir. 2004). In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d 158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court

---

[3] Petitioner asserts that the state courts have failed to address certain of his claims and that he is, therefore, entitled either to a decision here or remand for a decision by the state courts. Petitioner is not correct. The state courts have ruled on all claims presented to them; however, with respect to certain claims, the state courts found them "without sufficient merit to warrant discussion in a written opinion." See State v. Planker, 2011 WL 867245, *2.

cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 397-98 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002) and Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Carrascosa v. McGuire, 520 F.3d 249, 255 & n.10 (3d Cir. 2008).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010) (citing United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969)); Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989).

### III. ANALYSIS

#### A. Request for Stay

Petitioner has asked this Court to stay this matter pending resolution of a second and third state PCR petition. The only information Petitioner has provided regarding the second PCR petition is that it raises unexhausted claims of ineffective assistance of PCR counsel and appellate PCR counsel, which claims could not have been raised prior to the completion of the initial PCR proceedings.

A state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[]

the remedies available in the courts of the State," unless "there is an absence of available State

corrective process[] or ... circumstances exist that render such process ineffective ... ." 28 U.S.C.

§ 2254(b)(1). See also Rose v. Lundy, 455 U.S. 509, 515 (1982); Lambert v. Blackwell, 134

F.3d 506, 513 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001) (finding that "Supreme Court

precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court]

must consider whether [petitioner] is required to present [his or her] unexhausted claims to the

[state's] courts").

    In recognition of the complexities facing prisoners who must exhaust their state remedies

while complying with the one-year federal limitations period for § 2254 habeas petitions, see 28

U.S.C. § 2244(d)(1), the Court of Appeals for the Third Circuit has held that "[s]taying a habeas

petition pending exhaustion of state remedies is a permissible and effective way to avoid barring

from federal court a petitioner who timely files a mixed petition."[4] Crews v. Horn, 360 F.3d

146, 151 (3d Cir. 2004). Indeed, the Court of Appeals for the Third Circuit has held that "when

an outright dismissal could jeopardize the timeliness of a collateral attack, a stay is the only

appropriate course of action." Crews, 360 F.3d at 154. The Supreme Court, however, has

somewhat limited the stay-and-abeyance rule announced in Crews.

> [S]tay and abeyance should be available only in limited circumstances. ...
> [S]tay and abeyance is only appropriate when the district court determines there
> was good cause for the petitioner's failure to exhaust his claims first in state court.
> Moreover, even if a petitioner had good cause for that failure, the district court
> would abuse its discretion if it were to grant him a stay when his unexhausted
> claims are plainly meritless.
>
> ...
>
> On the other hand, it likely would be an abuse of discretion for a district
> court to deny a stay and to dismiss a mixed petition if the petitioner had good

---

[4] A "mixed" petition is one which contains both exhausted and unexhausted claims. See Crews
v. Horn, 360 F.3d 146, 147 (3d Cir. 2004).

cause for his failure to exhaust, his unexhausted claims are potentially
meritorious, and there is no indication that the petitioner engaged in intentionally
dilatory litigation tactics. In such circumstances, the district court should stay,
rather than dismiss, the mixed petition. ... For the same reason, if a petitioner
presents a district court with a mixed petition and the court determines that stay
and abeyance is inappropriate, the court should allow the petitioner to delete the
unexhausted claims and to proceed with the exhausted claims if dismissal of the
entire petition would unreasonably impair the petitioner's right to obtain federal
relief.

Rhines v. Weber, 544 U.S. 269, 277-78 (2005) (citations omitted).

Here, Petitioner has failed to demonstrate that he requires a stay to exhaust a "potentially

meritorious" claim. To the contrary, § 2254 explicitly excludes from the scope of federal habeas

relief a claim based upon ineffective assistance of PCR counsel. "The ineffectiveness or

incompetence of counsel during Federal or State collateral post-conviction proceedings shall not

be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). See also

Coleman v. Thompson, 501 U.S. 722, 752-53 (1991) (holding that there is no constitutional right

to counsel in state post-conviction relief proceedings and, consequently, that ineffective

assistance of counsel in state post-conviction relief proceedings does not provide a ground for

federal habeas relief); Taylor v. Horn, 504 F.3d 416, 437 n.17 (3d Cir. 2007) (noting same and

citing Coleman).

Petitioner's reliance on Martinez v. Ryan, 132 S.Ct. 1309 (2012), is misplaced. In

Martinez, the Supreme Court held that ineffective assistance of counsel in an initial-review

collateral proceeding, on a claim of ineffective assistance of trial counsel, may establish "cause"

for a procedural default in a federal habeas proceeding as to that claim, only. Id. at 1315

(limiting Coleman v. Thompson, supra). The rule adopted in Martinez does not extend,

however, to "attorney errors in other kinds of proceedings, including appeals from initial-review

collateral proceedings, second or successive collateral proceedings, and petitions for

discretionary review in a State's appellate courts." Id. at 1320.

Here, there is no procedural default to preclude this Court's consideration of Petitioner's claims of ineffective assistance of trial and appellate counsel. To the contrary, Petitioner presented exhaustive and comprehensive claims of ineffective assistance of trial (and appellate) counsel in his initial state PCR proceeding. Although the Appellate Division found certain claims procedurally barred, it nevertheless addressed them, in the alternative, on the merits. See generally State v. Planker, 2011 WL 867245 (N.J. Super. App. Div. Mar. 15, 2011); State v. Planker, 2010 WL 2471163 (N.J. Super. App. Div. June 18, 2010). Accordingly, this Court need not await the conclusion of Petitioner's second and third state PCR proceedings in order to review the findings of the New Jersey courts with respect to Petitioner's claims of ineffective assistance of trial and appellate counsel. The request for a stay will be denied.

B.     Motions to Supplement Record

Petitioner has filed two Motions [16, 18] to expand the record filed by Respondent. In the first, Petitioner asks for an order compelling Respondent to disclose whether the juvenile witness Nicholas Ranieri was on juvenile probation at the time he provided his statements to police. In the second, Petitioner asks for an order compelling Respondent to "complete" the record by providing transcriptions of previously untranscribed pretrial hearings and jury selection proceedings, Petitioner's letters to the trial court, which he asserts relate to his claim that he was deprived of his right of self-representation, and pro se PCR motions, a motion for leave to file a successive PCR, and a motion for reconsideration of the denial of leave to file a successive PCR, which he contends support his claims of ineffective assistance of PCR counsel.

The Supreme Court has recently emphasized that, with respect to any claim that was adjudicated on the merits in state court, federal review under § 2254(d)(1) is limited to the record

that was before the state court that adjudicated the claim. Cullen v. Pinholster, 131 S.Ct. 1388, 1398-99 (2011). In addition, as noted by the Court of Appeals for the Third Circuit, "review of a claim under § 2254(d)(2) is specifically limited to 'evidence presented in the State court proceeding.'" Grant v. Lockett, 709 F.3d 224, 231 (3d Cir. 2013). Thus, "as a general rule, 'district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d).'" Grant v. Lockett, 709 F.3d at 231 (quoting Brown v. Wenerowicz, 663 F.3d 619, 619 (3d Cir. 2011)).

Respondent has supplied complete copies of the briefs and appendices submitted by Petitioner and his counsel to the state courts. None of the additional information Petitioner requests in his Motions was before the Appellate Division or Supreme Court of New Jersey when they rejected all of his claims on the merits. Accordingly, it is not appropriate to add them to the record before this Court. Moreover, as noted above, the documents related to claims of ineffective assistance of PCR counsel, asserted in Petitioner's second and third PCR petitions, are completely irrelevant, as those claims of ineffective assistance of PCR counsel are not viable, here. Finally, Petitioner has failed to meet the standard of § 2254(e)(2), which permits district courts, at their discretion, to hold evidentiary hearings only in very narrow circumstances, none of which apply here.[5] See generally Palmer v. Hendricks, 592 F.3d 386 (3d Cir. 2010). The

---

[5] In general, if a petitioner has failed to develop the factual basis of a claim in state court, a federal district court is precluded from holding an evidentiary hearing unless the petitioner shows that the claim relies on a new and retroactive rule of constitutional law or a factual predicate that could not previously have been discovered through the exercise of due diligence, and "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e). Petitioner has not even attempted to meet the criteria of § 2254(e). Certainly, the claims asserted do not rely on either a new rule of constitutional law or a factual predicate that could not previously have been discovered. Nor is there any suggestion that any of the requested evidence can establish that, but for constitutional error with

Motions will be denied.

C.     Right to Self-Representation

Petitioner contends that he was denied his Sixth Amendment right to self-representation.

The Appellate Division exhaustively analyzed and rejected this claim on direct appeal.  To

properly analyze the Appellate Division's conclusions, I recount the Appellate Division's

lengthy ruling, which includes discussion of the trial court transcript.

> Defendant contends he is entitled to a new trial because he was wrongfully denied his constitutional right of self-representation.  After the return of the indictment on February 6, 1998, the Bergen County Public Defender's Office undertook representation of defendant.  However, due to a conflict, outside counsel, John L. Weichsel, was assigned to take over representation.  On March 1, 1999, thirteen months after the indictment and eight months before the commencement of trial, a status conference was held before Judge John A. Conte.  Judge Conte noted that at the previous status conference, defendant expressed a desire to represent himself.  After engaging in an extensive colloquy with defendant, Judge Conte concluded that defendant had made a knowing, intelligent and voluntary waiver of his right to represent himself.  Defendant also expressed his wish that Weichsel remain available to advise and assist him.  Judge Conte ordered that defendant be permitted to proceed pro se, and designated Weichsel standby counsel.  The State did not oppose defendant's request in the trial court, and does not deny on appeal that the self-representation order was properly entered.
>
> The case was then transferred to Judge Meehan, who conducted the remainder of the pre-trial proceedings and presided over the trial.  At the next status conference, on April 19, 1999, defendant complained to Judge Meehan that there had still been no investigation undertaken on his behalf by the public defender's office.  A representative of the public defender's office stated:  "Our position is that we are in or out.  If we are out the most we will do is stand by counsel and answer [defendant's] questions.  … Your Honor hasn't ordered anything.  If Your Honor orders something maybe our position will be different.  We are not volunteering to undertake any investigations for [defendant] unless Mr. Weichsel is the attorney of record."
>
> The following discussion then took place:
>
> THE COURT:  You believe that you are capable of

---

respect to such evidence, no factfinder would have found Petitioner guilty of the crimes of which
he was convicted.

handling this matter?

> [DEFENDANT]: No. Not entirely. <u>I'm asking for co-counsel, and if the Public Defender's Office does not want to issue co-counsel, I'm asking that the court act as co-counsel.</u>

> THE COURT: The court will not act as co-counsel.

> [DEFENDANT]: Somebody has to. If I'm going to be granted <u>pro se</u> or to be, <u>the only thing I'm asking is that I be able to cross examine the witnesses that I want to cross examine, I'll be able to present my opening and closing statement and that's it.</u> Other than that, I mean the only reason I'm even taking this … stance right now is because nothing was done that I wanted. As a matter of fact, the opposite things were done that I asked for. What am I going to do, sit back and let everybody do what they want? It's my life on the line here. … It's my life that we are talking about. <u>I would like to play a role in it.</u>

> [Emphasis added by Appellate Division.]

The judge then asked Weichsel "What reason is there that you could not handle the matter?" Weichsel responded that he didn't think defendant had "any confidence in [him]," to which defendant responded, "I don't feel that way. I have 100 percent confidence in Mr. Weichsel. The problem is that I don't have confidence that he has confidence." The judge then said to Weichsel, "I will put you back in the case right now. We will keep this probably coming in about every week or two." He then stated that he was "vacating the order" allowing defendant to represent himself, after which the following colloquy occurred:

> [DEFENDANT]: I'm … no longer able to participate?

> THE COURT: You can.

> [DEFENDANT]: As far as -

> THE COURT: Right now. We may deal with it down the road.

> You have to make the choice when the trial date gets set as to whether you want to try the case entirely or you want Mr. Weichsel to try it entirely.

> [DEFENDANT]: <u>It can't be done halfway?</u>

> THE COURT: Not unless you, and Mr. Weichsel and the

Public Defender's Office can agree on some division of responsibilities. Because one of the first appeals in every murder case that I've ever seen is incompetent counsel. It's added in.

…

It's so, Mr. Weichsel, if he's going to try the whole case, and you want to accuse him of incompetent counsel down the road, it's fine if you do.

[DEFENDANT]: Your Honor -

THE COURT: If you can do some research, and find something that deals with it, we will consider it.

[DEFENDANT]: That's what I will do.

I'm not asking Mr. Weichsel to come in, and do what I tell him to do, and this and that, and blah, blah.

I believe that's my right to be able to do this.

THE COURT; Look it up. If you come up with a case that says it.

[Emphasis added by Appellate Division.]

Throughout subsequent pre-trial hearings, defendant was represented by Weichsel. There were status conferences on April 27, May 4, May 11, June 2, July 8 and August 19, 1999. An extensive evidentiary hearing was conducted on October 6, 1999 and the judge rendered his decision in court, with defendant and counsel present, on October 8, 1999. At all of these proceedings, Weichsel acted as defendant's counsel without objection by defendant. On October 8, 1999, following the denial of his motion to suppress, defendant requested, through counsel, permission to ask questions along with Weichsel. The judge responded:

I'm not going to - I don't even - first of all, other than when there are two attorneys, my rule is only one attorney per witness, whoever - like someone stands up and objects, they got that witness whether they like it or not.

But I'm not going to do … I don't think it works well as a strategy, you have - certainly would be destroyed as an attorney. Questions may not follow through and sequences from one witness to another, and I'm going to deny the request.

MR. WIECHSEL:  And just -- I want to note for the record, that's what my client wants.

Weichsel continued to represent defendant when the trial began.  On October 26, 1999, Weichsel made his opening statement.  The State called several witnesses.  Weichsel interposed objections and cross-examined the witnesses uneventfully.  On October 27, 1999, the same format continued.  Then, for the first time during the trial, in the midst of the October 27, 1999 session, defendant asked to restore Weichsel to his standby role.  He explained to the judge that there were questions he believed should be asked that his attorney was not asking.  He stated, "I am prepared to ask the questions that need to be asked."  Judge Meehan replied, "That's why I requested Mr. Weichsel to stay next to you, so that you can communicate with him."  Defendant concurred, stating, "I now understand that.  I will abide by those rulings.  That wasn't stipulated before.  Thank you."

Subsequent to this colloquy, defense counsel stood next to defendant at all times while counsel was asking questions, and defendant told counsel what questions to ask.  In spite of his numerous conferences with defendant, defense counsel refused to ask certain questions or call certain witnesses that he deemed irrelevant.  On November 11, 1999, defense counsel set forth on the record, in camera, his reasons for not complying with all of defendant's requests.

On appeal, defendant asserts his conviction should be reversed because his actions did not justify Judge Meehan's revocation of his right of self-representation.  The State concedes that defendant initially waived his right to counsel and elected to proceed pro se, with standby counsel, before Judge Conte.  Nevertheless, it contends defendant subsequently waived his right of self-representation by vacillating on the issue and by indicating his desire to proceed as co-counsel.  We agree.

The Sixth Amendment grants a defendant the right to represent himself or herself in a criminal proceeding.  See, e.g., Faretta v. California, 422 U.S. 806, 821, 95 S. Ct. 2525, 2534, 45 L. Ed. 2d 562, 574 (1975); …; State v. Gallagher, 274 N.J. Super. 285, 294 (App. Div. 1994).  This right may only be exercised if the defendant first knowingly and intelligently waives his or her right to counsel.  McKaskle v. Wiggins, 465 U.S. 168, 173, 104 S. Ct. 944, 948, 79 L. Ed. 2d 122, 130 (1984); … .  …

A defendant who chooses to proceed pr se must be "'able and willing to abide by the rules of procedure and courtroom protocol.'"  Gallagher, supra, 274 N.J. Super. at 297 (quoting McKaskle, supra, 465 U.S. at 173, …).  …  [A] judge's decision to revoke the defendant's right of self-representation may not be based on the defendant's lack of "'technical legal knowledge'" or on the complexity of the case.  Id. at 300-01 (quoting Faretta, supra, 422 U.S. at 836, …).  To make a contrary determination is reversible error.  Id. at 301.

In State v. Thomas, 362 N.J. Super. 229 (App. Div. 2003), we found an effective assertion of the right to self-representation where the request was timely made, there was no attempt to delay, no indication of disruptive behavior, and a full understanding of the consequences. Id. at 240. Critical to our holding was the fact that "over several court sessions, defendant remained adamant in his desire to represent himself. His assertion of the right was absolutely unequivocal." Ibid. We cautioned that "[t]rial judges should treat waiver of counsel requests with skepticism and circumspection. They should be wary of defendants who are attempting to manipulate the orderly administration of criminal justice by hedging their positions, attempting to delay, seeking to disrupt, or using any other means." Id. at 243. We noted that a defendant cannot be deceptive with the court by "wavering between assigned counsel and self-representation … ." Id. at 241 … .

Similar considerations guide the issue of waiver of the right of self-representation after the right has been effectively asserted. Though no New Jersey state court has directly addressed the issue, courts in other jurisdictions have found that a defendant, once having been granted the right of self-representation, may waive the right. Buhl v. Cooksey, 233 F.3d 783, 800 (3d Cir. 2000) (citing other pertinent cases). These courts have commonly found waiver where the defendant has vacillated between being represented by counsel and self-representation, where the defendant abandons his or her request for self-representation and where the defendant elects to act as co-counsel. Id. at 800-01; … . If the judge's ruling is categorical and expressly denies the defendant's request, however, the defendant's subsequent acquiescence cannot signify a waiver. Williams v. Bartlett, 44 F.3d 95, 101 (2d Cir. 1994).

On this record, we find no error in Judge Meehan's decision to prohibit defendant from representing himself. Although defendant did not exhibit the type of outrageous conduct that would justify termination of his right of self-representation under Gallagher, defendant effectively waived the right by expressing his desire to act as co-counsel and by abandoning his request until mid-trial. It is unclear from the transcript what defendant's initial intentions were when he waived his right to counsel before Judge Conte on March 1. It is abundantly clear, however, from the April 19 hearing before Judge Meehan that defendant did not wish to proceed pro se with Weichsel acting as standby counsel but instead desired to engage in some hybrid form of representation. …

This type of hybrid representation is disfavored in New Jersey. "Although a defendant has the constitutional right to proceed with or without counsel …, the right to hybrid representation may be foreclosed and is to be avoided wherever possible." Further, by making a request to engage in hybrid representation, defendant waived his right to represent himself.

Moreover, defendant waived his right to self-representation by abandoning his request to proceed pro se. During the April 19 hearing, Judge Meehan told

defendant "to make the choice when the trial date gets set as to whether you want to try the case entirely or you want Mr. Weichsel to try it entirely." During the many subsequent pre-trial hearings, defendant never reiterated his request to proceed pro se. The next time defendant mentioned his desire to participate in some way was on October 27, 1999, the second day of trial. After a trial has commenced, however, a defendant's right to self-representation is "curtailed," and the judge must weigh the defendant's interests against the potential disruption of the proceedings. Buhl v. Cooksey, supra, 233 F.3d at 797 n.16. Further, on October 27, defendant effectively withdrew his request to proceed pro se after the judge explained that he requested defense counsel to remain next to defendant so that defendant could communicate with him. Defendant's subsequent mid-trial "requests" are better characterized as criticisms of the judge's previous decision prohibiting defendant from representing himself. The judge did not abuse his discretion by refusing to revisit his earlier ruling.

Finally, the record indicates that both Judge Meehan and Weichsel went out of their way to preserve defendant's rights. Even though "[a] defendant does not have a constitutional right to choreograph counsel's role," the judge essentially granted defendant such a right by requesting that defense counsel remain next to defendant. Defense counsel complied with the judge's request by repeatedly conferring with defendant and allowing defendant to control his examination of witnesses. "In determining whether a defendant's Faretta rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." McKaskle, supra, 465 U.S. at 177, … . Defendant received more than a "fair chance" to present his case in the manner in which he desired.

(Answer Ex. 3, Opinion of the Appellate Division at 15-27 (citations omitted).)

The Sixth Amendment, applicable to the states through the Fourteenth Amendment Due Process Clause, see Faretta v. California, 422 U.S. 806, 818-19 and n.14 (1975), sets forth the rights necessary to a full defense by a criminal defendant:

In all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

As the Supreme Court has noted, the Sixth Amendment "grants to the accused personally the right to make his defense." Faretta, 422 U.S. at 819. "Although not stated in the

Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." Id. (footnote omitted). A criminal defendant seeking to represent himself must assert his desire to proceed pro se "clearly and unequivocally." U.S. v. Peppers, 302 F.3d 120, 132 (3d Cir. 2002) (citing Buhl v. Cooksey, 233 F.3d 783, 791 (3d Cir. 2000)). In addition, a trial court faced with such a request must assure itself that the defendant is competent to stand trial and must "inquire thoroughly to satisfy itself that the defendant understands 'the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved,'" in other words, that the request is knowing and intelligent. Peppers, 302 F.3d at 132 (citations omitted). A request to proceed pro se must be made timely, and may be considered timely when made up to the eve of trial, or even on the first day of trial before jury selection. See United States v. Bankoff, 613 F.3d 358, 373 (3d Cir. 2010) (collecting cases). After trial has commenced, however, the right to self-representation is "curtailed." Buhl, 233 F.3d at 797 n.16, quoted in U.S. v. Bankoff, 613 F.3d 358, 373 (3d Cir. 2010). "In that context, district courts have discretion to deny an untimely request to proceed pro se after weighing the "'prejudice to the legitimate interests of the defendant' against the 'potential disruption of proceedings already in progress.'" Buhl, 233 F.3d at 797 n.16, quoted in Bankoff, 613 F.3d at 373 (footnote and additional citations omitted). "It is well established that a defendant can waive the right of self-representation after asserting it." Buhl v. Cooksey, 233 F.3d 783, 800 (3d Cir. 2000). Notably, however, "Faretta does not require a trial judge to permit 'hybrid' representation." McKaskle v. Wiggins, 465 U.S. 168, 183 (1984). "A defendant does not have a constitutional right to

choreograph special appearances by counsel." Id.[6]

Here, the Appellate Division correctly identified and applied the applicable Supreme Court precedent regarding the right to self-representation and waiver of that right, as well as lower court opinions interpreting that precedent. As illustrated above, the Appellate Division relied on the Third Circuit's decision in Buhl in reasoning that Petitioner had effectively waived his right to self-representation. In addition, the Appellate Division properly concluded, relying on the U.S. Supreme Court's decision in McCaskle, that the Sixth Amendment does not require that the trial judge have permitted hybrid representation. The Appellate Division's decision is neither contrary to, nor an unreasonable application, of the controlling Supreme Court precedent; nor is the Appellate Division's decision that Petitioner waived his Sixth Amendment right to self-representation unreasonable in light of the evidence before it. Petitioner is not entitled to relief on this claim. Cf. Brathwaite v. Phelps, 415 F.App'x 142 (3d Cir. 2011) (holding that state court's decision that petitioner had implicitly waived right to self-representation after attorney was appointed was not unreasonable application of Supreme Court precedent).

D.    Ineffective Assistance of Counsel

Petitioner contends that he is entitled to federal habeas relief based upon ineffective assistance of trial and appellate counsel who allegedly failed to protect his right to a fair trial in several ways. According to Petitioner, counsel erred by failing to object to introduction of evidence of other crimes and other bad acts, by failing to confront witnesses against him, by failing to object to the denial of a public trial, by failing to insist on his (Petitioner's) presence at all stages of trial, by failing to object to an impaired juror, by failing to insist on Petitioner's right

---

[6] Weichsel was not appearing as "standby" counsel at trial, so this Court need not consider the scope and limitations of such appearances. See generally, McKaskle v. Wiggins 465 U.S. 168 (1984); U.S. v. Isaac, 655 F.3d 148 (3d Cir. 2011).

to self-representation, and by all other issues listed in state filings.[7]  (Petition, ¶ 12.)  Before the Appellate Division, Petitioner's counsel asserted that trial counsel failed to conduct an adequate pre-trial investigation, failed to rely on credible "quasi-alibi" witnesses, failed to develop a cogent trial strategy, failed to object to prejudicial and inflammatory testimony, failed to request appropriate limiting instructions.  Petitioner further asserted that appellate counsel failed to provide constitutionally effective assistance by failing to raise these issues on direct appeal. (Answer, Ex. 6, Brief.)  In his pro se brief before the Appellate Division, Petitioner expanded upon the claims raised by his counsel, including additional facts, and asserting that the PCR court had failed to rule on all the ineffective assistance claims raised.  He also asserted a right to relief based upon cumulative errors by his counsel.  (Answer, Ex. 11, Brief.)

After a non-evidentiary hearing, at which Petitioner was permitted to present his own arguments in addition to those of counsel, the PCR court identified <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), as the controlling precedent, then found both that the performance of Petitioner's trial and appellate counsel was not deficient and that Petitioner could not establish prejudice as the result of counsel's performance.  (Answer, Ex. 43, Tr. of PCR Hearing, at 52-60.)  The PCR court concluded:  "This Court finds that the reason the defendant was convicted was due to the fact that the defendant committed the crime, and there's overwhelming evidence to prove it."  (<u>Id.</u> at 59.)

On appeal of the denial of post-conviction relief, the Appellate Division rejected all of Petitioner's claims of ineffective assistance of trial and appellate counsel.  I, again, recount the

_____

[7] In his state filings, Petitioner enumerated many specific instances of alleged ineffective assistance generally falling within several broad categories, as listed in his Petition and as addressed by the Appellate Division.  For example, Petitioner has detailed several instances where evidence of prior crimes or bad acts were admitted, including evidence of prior threats against the victim or mistreatment of other women with whom he had relationships.

Appellate Division's thorough analysis in preparation for my review of that court's conclusions.

On appeal from the denial of his PCR petition, defendant offers the following arguments: (1) he was improperly denied an evidentiary hearing with respect to his claim of ineffective assistance of counsel; (2) his trial attorney's representation was ineffective because of the failure to conduct adequate pre-trial investigation, which included not interviewing relevant witnesses and failing to call "quasi-alibi witnesses" available at the time of trial; (3) his trial attorney's representation was also inadequate because of the failure to object to prejudicial and inflammatory testimony and the failure to request appropriate limiting instructions relating to such testimony; and (4) with respect to any meritorious issues that could have been, but were not, raised on direct appeal, defendant's appellate counsel was inadequate.

After carefully considering the record and briefs, we are satisfied that all of defendant's arguments are without sufficient merit to warrant discussion, R. 2:11-3(e)(2), and we affirm substantially for the reasons expressed by the trial court. Nevertheless, we add the following brief comments.

Defendant's primary argument concerns what he describes as his "quasi-alibi witnesses," Pat Gallagher, Sr., and Pat Gallagher, Jr. According to certifications from Pat Gallagher, Sr. and Carole Gallagher, they would have testified that defendant was in their home on August 15, 1997, from 12:00 a.m. until 4:30 a.m. Police testimony indicated that during his confession defendant had said that he buried the victim's body during that time period, and that was the only evidence on that point. The Gallaghers would also have testified that defendant could not have taken a shovel from their premises. Additionally, a certification from Sharmon Sabini states that another person had tried to solicit the victim's murder. Although the Gallaghers were present during the trial and although the judge had ruled, at defendant's personal request, that they be permitted to testify, defense counsel did not call them as witnesses; instead, instructing them to leave the courthouse. There is no indication that he interviewed them before excusing them.

For purposes of this opinion, we will assume that defense counsel's treatment of the Gallaghers was deficient, thereby satisfying the first prong of Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984). But to succeed in this context defendant must also establish that as a result there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct . at 2068, 80 L. Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Ibid.

At best, the Gallaghers' testimony does nothing more than suggest that defendant did not bury the victim when he told the police he had performed that act. Given the balance of the evidence bearing on defendant's guilt, which we will

now describe briefly, there is no reasonable probability that that testimony would have affected the result of the trial.

Defendant called the primary investigating detective a couple of days after the murder, telling him to look for the victim in Wildwood. He said he had last seen her a few days earlier when he helped her move out of her apartment. He called the detective again a few hours later and said that he and the victim were "pretty close." A few hours later detectives located defendant and brought him to the police station for questioning. During that questioning, defendant admitted to arguing with the victim in her apartment on August 15. He admitted to then having sexual intercourse with the victim.

On August 17, detectives found and searched a car that another person shared with defendant. The car contained a chain saw, a gas can, pickax, chopping ax, two shovels, and a bow saw.

On August 18, the police found the victim's car in the Vince Lombardi service area on the New Jersey Turnpike in Ridgefield. The car was unlocked and contained the car keys and a purse containing papers bearing the victim's name.

On August 20, during a consent search of the apartment defendant shared with another person, defendant approached one of the officers and said, "Just remember no body, no crime." Later that day, defendant's friend Nicholas Ranieri told the police that on August 17, defendant picked him up and drove to Jefferson Township, where he pulled onto a dirt road. In the car were shovels, a chain saw and a gas can. Defendant told Ranieri that "there's a body over there. You have to help me hide it." Ranieri described a mound of dirt that was a foot high and six feet long. Defendant started hopping on the mound and then "urinated on it." Defendant then put more dirt on the pile, cut down several trees with the chain saw, and pulled the trees over the mound. Before they left, defendant cut down another tree, causing it to fall across the dirt road to keep cars from entering the area. Ranieri drew a map of the grave location and the next day took the police there. The victim's body was found in the grave.

Defendant was arrested shortly after the body was discovered. At first he said the death was an "accident." Later, he described the events in detail, confirming that after beginning to engage in sexual intercourse with the victim, he strangled her to death with his hands. He told another friend, Mike Vasile that he had just murdered the victim. He admitted burying the victim and confirmed the other evidence obtained by the police during the investigation. The autopsy confirmed that defendant's spermatozoa was in the victim's vaginal canal and that she had been strangled.

The trial testimony included numerous descriptions of defendant's mistreatment of the victim and his threats to kill her.

Given the above evidence and the balance of the testimony submitted at trial, we reject defendant's claim that the evidence of the "quasi-alibi witnesses" could have changed the result.

With respect to defendant's claim that he was prejudiced by the evidence of his abusive course of treatment of the victim, we affirm substantially for the reasons expressed by the trial court. Of course, those issues, which are all based on the trial record, could have been raised on the direct appeal. Since they were not, they are barred absent exceptional circumstances. R. 3:22-4; State v. Mitchell, 126 N.J. 565, 587, 601 A.2d 198 (1992). There are no exceptional circumstances here. We note that much of that evidence came in as a result of questions that defendant demanded his attorney ask during the trial. Furthermore, since the arguments lack merit, there is no basis on which appellate counsel may be faulted for not raising them. Jones v. Barnes, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 3313, 77 L. Ed.2d 987, 994.

Since defendant's claims are entirely without merit when weighed against the overwhelming evidence of guilt, and since an evidentiary hearing could not have added anything to buttress defendant's case, the trial court was correct in denying one. State v. Preciose, 129 N.J. 451, 462-63, 609 A.2d 1280 (1992).

State v. Planker, 2010 WL 2471163, *1-*3.

In response to Petitioner's motion for reconsideration, the Appellate Division allowed

Petitioner to file a pro se brief raising additional claims of ineffective assistance of counsel and

rejected all the additional claims.

We will now dispose of the issues defendant raises, while incorporating by reference our previously filed opinion and our opinion on defendant's direct appeal. After carefully reviewing the record and briefs, we are satisfied that all of defendant's arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Nevertheless, we add the following comments.

Under his first point, defendant complains about the admission of evidence relating to other crimes, wrongs or acts. In our first opinion affirming the denial of post-conviction relief, we rejected this argument because it could have been raised on direct appeal, Rule 3:22-4, and because it had no merit whatsoever. Nothing in defendant's pro se brief convinces us otherwise.

Defendant also claims under his first point that he was denied presence at trial. The incident arose after the trial had been concluded except for deliberation by the jury. When the jury was brought in the next morning, defense counsel consented to the jury being sent out to begin deliberations without defendant's presence. The judge told the jury that he had given defendant permission to be

absent for this brief period of time. The claim is barred by Rule 3:22-4, and, in any case, the defendant suffered no prejudice.

Still under his first point, defendant claims that a juror was compromised because of a threat transmitted to the juror's husband. The prosecutor indicated that the husband had not said anything to his wife about the threat. Anyway, the juror did not deliberate on the case. Therefore, we perceive no prejudice and cannot fault appellate counsel for not raising this point in the direct appeal.

Just before summations and charge, another judge took over the trial because the trial judge was in surgery. Under his first point, defendant argues that Rule 1:12-3(b) was violated because the new judge was not "able to become familiar with the proceedings and all of the testimony therein through a complete transcript thereof." Ibid. Generally, the judge should make a statement on the record as to his or her familiarity with the transcript. Id. Comment 2. That did not happen here, but nothing in the rule or commonsense suggests that this failure on the part of the substituted judge requires reversal without a showing of prejudice. Again, the argument is barred since it could have been raised on appeal, and in any case the claim for automatic reversal for violation of the rule is without merit.

Defendant's second point concerns the failure to advance his partial alibi claim. We addressed and rejected this argument in our first PCR opinion.

Under his third point, defendant complains about the denial of effective assistance by his PCR counsel and about the denial of self-representation in the PCR proceedings. He suggests that his attorney failed to advance some of his claims, but in fact his attorney began his argument below by specifically incorporating all of the arguments defendant had put in his pro se petition for PCR. Although defendant says he attempted to proceed pro se at the PCR proceeding, the record is to the contrary, revealing, as it does, that the judge heard argument from both the attorney and defendant.

Although defendant claims, in his fourth point, that the PCR court did not rule on all his claims, that is simply not so. Apart from simply repeating prior arguments, which we have rejected, he says that had the trial judge not erred in admitting the other crimes evidence, the jury might have found him guilty of manslaughter instead of murder. But since we have rejected his contentions with respect to the admission of the other crimes evidence, this point is moot.

State v. Planker, 2011 WL 867245, *1-*3.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.

The right to counsel is "the right to underline effective assistance of counsel."  McMann v. Richardson,

397 U.S. 759, 771 n.14 (1970) (emphasis added) (citations omitted) , <u>cited in</u> <u>Ross v. Varano</u>, 712 F.3d 784, 797 (3d Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show <u>both</u> that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984). With respect to the "performance" prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> at 690-91. With respect to the "prejudice" prong, a "reasonable probability" of prejudice is "a probability sufficient to undermine confidence in the outcome." <u>Strickland</u> at 694. Thus, counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695. The performance and prejudice prongs of <u>Strickland</u> may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." <u>Id.</u> at 697.

If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of <u>Strickland</u>. <u>See</u> <u>Albrecht v. Horn</u>, 485 F.3d 103, 139 (3d Cir. 2007).

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). The Strickland standard for effective assistance of counsel applies to appellate counsel. See Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Boggs v. Diguglielmo, 264 F.App'x 165, 167-68 (3d Cir. 2008). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Here, the Appellate Division correctly identified and applied controlling Supreme Court precedent and principles. Moreover, its decisions were reasonable in light of the facts presented. This Court agrees that Petitioner has failed to demonstrate any prejudice from the alleged errors of counsel. As set forth in the opinion of the Appellate Division, see supra Section I.A. "Factual Background," the evidence of Petitioner's guilt was vast. Petitioner is not entitled to relief on this claim.

E.    Cumulative Error

Finally, Petitioner asserts that he is entitled to habeas relief based upon cumulative error evident from the trial record. The Appellate Division rejected this claim on appeal from the denial of PCR relief.

> Finally, defendant concludes by arguing that the "cumulative impact of the record-supported errors requires reversal of the conviction on the existing record...." Apart from the obvious fact that any such claim is barred by Rule 3:22-4, absent exceptional circumstances, here there is no accumulation of error. Consequently, we are once more obliged to affirm.

State v. Planker, 2011 WL 867245, *3.

Under certain circumstances, cumulative errors may demonstrate that a criminal defendant was denied a fair trial, even though individual errors do not justify relief.

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Albrecht v. Horn, 471 F.3d 435, 468 (3d Cir. 2006). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008).

This Court agrees with the Appellate Division that the claim of "cumulative error" is patently meritless. Petitioner is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citation omitted), cited in Eley v. Erickson, 712 F.3d 837, 845 (3d Cir. 2013).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

## V.  CONCLUSION

For the reasons set forth above, the Petition shall be denied.  In addition, the request for stay and all pending Motions will be denied.  No certificate of appealability will issue.  An appropriate order follows.

*/s/ Anne E. Thompson*

Anne E. Thompson
United States District Judge

Dated:  10/28/13